UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

ISKENDER KAPLLANI, et al.

Defendants.

Criminal No. 12-10052-RGS

**DEFENDANT ISKENDER KAPLLANI'S SENTENCING MEMORANDUM**

Defendant Iskender Kapllani, by and through his undersigned counsel, hereby submits this Sentencing Memorandum for the Court's consideration in connection with his sentencing in the above-captioned matter that is currently scheduled for October 21, 2015.  As explained below, Mr. Kapllani respectfully submits that, after consideration of all of the factors under 18 U.S.C. § 3553(a), a sentence of 120 months would be sufficient to achieve the purposes of sentencing in this case.  Mr. Kapllani contends that such a sentence would be wholly consistent with his otherwise applicable sentencing guideline range, would result in a severe and serious punishment for the offense for which he has been found guilty, would provide appropriate deterrence for the offense charged in this case, would appropriately consider his personal history and character, and would minimize any unwarranted sentencing disparities among the various defendants in this case.

Mr. Kapllani further requests that this Court recommend (1) that he be assigned to a facility as close to Boston as possible, where he can attempt to remain in regular contact with his wife and two children, and (2) that he participate in an intensive, 500-hour, drug treatment

1

program that offers him a full range of substance abuse and other counseling. Admission to such a counseling program would provide him with a greater ability to address his significant personal challenges and to return to his family after his eventual release from incarceration with a chance to lead a productive and healthy life.

## **THE DEFENDANT'S PERSONAL HISTORY**

Mr. Kapllani personal background is summarized in the Pre-Sentence Report ("PSR"). See PSR ¶¶ 81-94. Born in Fier, Albania in 1964, Mr. Kapllani was raised by his two parents under difficult, but supportive, circumstances. Id. ¶ 81. In 1990, Mr. Kapllani left Albania for Greece in order to escape the political and financial hardships of the country. Id. In 1992, with the support of an American-based Catholic organization, he was able to emigrate to the United States. Id.

In 1995, Mr. Kapllani married his wife, Majlinda, who is also a native of Albania. PSR ¶ 91. Since approximately 1998, they have resided in Massachusetts, where their two sons Gary (age 13) and Eric (age 9) were born. Id. In 2004, the Kapllani family moved to 60 Schiller Road, a modest two-family home located in Dedham, Massachusetts. Id. ¶ 93. The two boys are students in the Dedham public school system and Mrs. Kapllani works as a dental hygienist. Id. ¶ 91. Not surprisingly, the family has struggled significantly (both emotionally and financially) since Mr. Kapllani's 2012 arrest in connection with this matter. Id. ¶ 94. See generally Exhibit A (letters from family members and friends).

Since arriving in the United States, Mr. Kapllani has worked regularly to support himself and his family. For much of that time, Mr. Kapllani has been involved in restaurant-related businesses. From approximately 2001 through 2005, he owned and operated Mikonos Pizza in Brighton, Massachusetts. PSR ¶ 109. After he sold the business due to dwindling profits, Mr.

Kapllani worked as a cook at the Farm and Grill Restaurant in Newton, Massachusetts. Id. ¶ 107. In addition, commencing in approximately 2005, Mr. Kapllani began investing with friends to purchase, rehabilitate and sell several older homes in the Worcester area. Id. ¶ 108.

A marked change in Mr. Kapllani's life began in approximately 2009 when he made a decision to invest in a new restaurant in Roslindale, Massachusetts, the Arbri Café. As demonstrated during the course of the trial, soon after he began working at the Arbri Café, Mr. Kapllani became involved with a group of other Albanian individuals, including co-defendants Igli Leka and Elton Ceku, who were actively engaged in drug trafficking in the Boston area. It was during this period, that Mr. Kapllani began using cocaine. That use became problematic for Mr. Kapllani in approximately 2010 and continued through 2012 until his arrest for the instant offense. PSR ¶ 101.

## THE OFFENSE CONDUCT

On May 28, 2015, the jury in this case found Mr. Kapllani guilty of participating in a conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine. The jury further found that the conspiracy involved five kilograms or more of cocaine and that five kilograms or more of cocaine was attributable and reasonably foreseeable to Mr. Kapllani. PSR ¶ 2. As a result of these jury findings, Mr. Kapllani is currently facing a ten year minimum mandatory sentence of imprisonment in this case. 21 U.S.C. §§ 846 and 841(b)(1)(A).

The evidence presented by the government at trial focused generally on three categories of conduct relating to Mr. Kapllani. First, the government presented evidence relating to a "reverse sting" transaction in Homestead, Florida on March 1, 2010 involving Mr. Kapllani and co-defendant Brian Mendoza. That "reverse sting"—a portion of which was captured on

videotape—involved a proposed sale of three kilograms of cocaine to Messrs. Kapllani and Mendoza by several undercover Florida police officers.  PSR ¶ 13.

Second, the government presented various pieces of evidence which sought to establish that Mr. Kapllani, along with Mr. Leka and Mr. Ceku, was engaged in the purchase and sale of powder cocaine in and around the Arbri Café in Roslindale, Massachusetts between approximately mid-2009 through early 2012.  The government investigation of Messrs. Kapllani, Leka and Ceke at the Arbri Café included visual surveillance activities, the use of pole cameras, interceptions of various telephone conversations, and undercover wire recordings obtained with the assistance of cooperating witnesses.

Finally, the government presented evidence relating to the supposed provision of various quantities of powder cocaine to Messrs. Kapllani, Leka and Ceku by co-defendants Armand Mara, Tony Bedini and Arben Teta, three Albanian individuals who were based primarily on the West Coast.  At trial, Messrs. Mara and Teta both testified—*albeit* inconsistently—that at various times during 2010 and 2011 they worked with Mr. Bedini to sell quantities of cocaine to both Leka and Kapllani.  Mara, an admitted "international drug trafficker," testified that he and Mr. Bedini transported powder cocaine to Boston and to other locations by secreting it in the cushion of his wheelchair.  PSR ¶¶ 17, 19, 22.  Teta testified that he obtained quantities of cocaine from Messrs. Bedini and Mara in California and transported it to Boston (and other destinations) in a secret compartment located in a Chevrolet Suburban provided to him by Mara and Bedini.  PSR ¶¶ 23-24.  Both Mara and Teta acknowledged at trial that, during this same time period, they also supplied powder cocaine to other customers in Connecticut, New York, New Jersey and Canada.  See, e.g., PSR ¶¶ 17, 18, 19, 42.

At the conclusion of the trial, the jury found both Mr. Kapllani and Mr. Bedini guilty of participating in the charged conspiracy.  The jury further found that Mr. Kapllani was responsible for five or more kilograms of cocaine.  Notably, however, the jury concluded that Mr. Bedini was *not* responsible for five or more kilograms of cocaine.  Accordingly, the jury necessarily disbelieved substantial portions of Mara's and Teta's testimony regarding the supposedly large quantities of cocaine allegedly provided by Mara and Bedini to Messrs. Kapllani, Leka and Ceku.

## **THE APPLICATION OF THE SENTENCING GUIDELINES**

As noted in the PSR, the parties have several material disputes regarding the proper calculation of Mr. Kapllani's offense level under the United States Sentencing Guidelines.  The PSR concludes that Mr. Kapllani is accountable for at least 44 kilograms of cocaine, setting his base offense level at **32**.  PSR ¶¶ 60-61.  The PSR further concludes that Mr. Kapllani was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  PSR ¶ 64.  Accordingly, the PSR adds four points to his offense level pursuant to U.S.S.G. § 3B1.1(a).  Id.  Thus, the PSR calculates Mr. Kapllani's final total offense level as **36** and his criminal history category as **I**, resulting in a recommended sentencing range of **188 to 235 months**.  PSR ¶ 115.

Mr. Kapllani has objected to two portions of the PSR's offense level calculation: (1) the determination that he is responsible for 44 kilograms of cocaine and that his base offense level is therefore **32**, see PSR ¶ 60 & Defendant's Objections Nos. 15-16, and (2) the determination that he was an "organizer or leader" of the consipiracy and that four additional levels should therefore be added to his offense level pursuant to U.S.S.G. § 3B1.1(a).  See PSR ¶ 64 and Defendant's Objection  No. 17.  Mr. Kapllani contends that his final total offense level is

5

properly calculated as **30**, and that the resulting guideline sentencing range should be **97-121 months**.  See Defendant's Objections Nos. 18, 24.

Each of these issues is addressed briefly below.

### A.    The Attribution of 44 Kilograms of Cocaine to Mr. Kapllani is Inconsistent with the Evidence and the Jury's Verdict.

Mr. Kapllani first contends that the evidence presented at trial does not support the PSR's conclusion that he is responsible for 44 kilograms of powder cocaine.  Rather, he contends that the evidence as interpreted by the jury supports (at most) a conclusion that he was responsible for between 5 and 15 kilograms.  As a result, his proper base offense level should be **30**, not **32** as calculated by the PSR.  The primary bases for these objections is set forth in his written objections to the PSR.  See, e.g., Defendant's Objection to Paragraph 60.

Among other things, Mr. Kapllani disputes the PSR's conclusion that he is somehow responsible for a total of 6 kilograms of cocaine that was allegedly personally delivered by Mr. Bedini to Mr. Kapllani in November and December of 2010 and March of 2011.  PSR ¶¶ 17-18, 20.  While there is certainly evidence that Mr. Bedini travelled between California and Boston during these time periods, the only evidence to support the notion that Mr. Bedini delivered this amount of cocaine to Mr. Kapllani appears to be the testimony of Armand Mara, an admitted drug trafficker whom the jury plainly disbelieved on this point.  Indeed, had the jury accepted Mr. Mara's account of these supposed deliveries, it necessarily would have found that Mr. Bedini was responsible for 5 or more kilograms of cocaine.  It failed do so—acquitting Mr. Bedini of being responsible for 5 kilograms or more of cocaine.  This Court should similarly disregard this evidence.

More importantly, thus Court should reject the PSR's reliance upon Arben Teta's broad and unsupported "estimate" that he delivered approximately **24 kilograms** of cocaine to Mr.

6

Kapllani through a series of deliveries from California to Boston in the spring and summer of 2011. PSR ¶¶ 24-25. *First*, Teta claimed that he obtained this large amount of cocaine directly from Bedini—including an assertion that he packed his vehicle with cocaine at Mr. Bedini's home in California. That contention that was necessarily rejected by the jury in this case and should be similarly rejected by this Court. *Second*, Teta ultimately acknowledged during trial that the actual destination for many of his trips from the West Coast was his former neighborhood in Connecticut—*not* Boston. That fact was confirmed at trial by his various hotel receipts and other travel records relating to Mr. Teta's trips.[1]  Accordingly, the suggestion in the PSR that 100% of the cocaine Teta was supposedly carrying in the Suburban was delivered to Boston is highly doubtful. *Third*, the notion that Teta delivered this enormous amount of cocaine to Kapllani during 2011 is particularly ludicrous in light of apparent difficulty that Mr. Kapllani and the other individuals at the Arbri Café regularly had paying for even one or two such kilograms. See PSR ¶ 17 ("Leka and Kapllani were unable to pay Mara and Bedini for the [two kilograms of] cocaine" and ultimately made only "partial payment"); PSR ¶ 28 (Teta claiming that he was "waiting for payment" for two kilograms of cocaine); PSR ¶ 40-41 (Kapllani allegedly struggling to pay for one kilogram of cocaine). In light of this evidence of non-payment, it is difficult to believe that Teta would have been making multiple six-kilogram deliveries to Kapllani throughout 2011.

Teta's broad estimates and the other large estimates of supposed drug deliveries to Mr. Kapllani set forth in the PSR are also belied by the evidence obtained by agents during the course of their investigation in this case. While Mr. Teta claims to have made multiple six kilogram deliveries, the only amounts actually observed and/or seized by agents were the two

---

[1] At trial, Mr. Teta testified that that he stayed in Connecticut because it was the most "convenient" place for him to stay when he was visiting Roslindale, Massachusetts.

kilograms seized from Mr. Tejada on August 3, 2011 and the half kilogram obtained from Mr. Neziri in December 2011.  Indeed, despite the extensive and lengthy nature of the government investigation in this case, none of the pole camera evidence, the recorded telephone calls, or the undercover wires obtained by the government at trial appear to address amounts greater than 2 kilograms (the seizure from Mr. Tejada), and often appear to refer to smaller amounts.[2]  Thus, the evidence presented at trial falls far short of establishing that Mr. Kapllani was responsible for the 44 kilograms set forth in the PSR.

For all the foregoing reasons, as well as those set forth in his written objections to the PSR, Mr. Kapllani respectfully suggests that this Court conclude that he be deemed responsible for between 5 and 15 kilograms of cocaine, resulting in a base offense level of **30** rather than **32**.

B.  **There is Insufficient Evidence to Support a Four-Level Leadership Enhancement Under U.S.S.C. § 3B1.1(a).**

Mr. Kapllani further disputes the PSR's determination that he was an "organizer or leader" of the criminal activity that was the subject of this case.  The PSR concludes that Mr. Kapllani "coordinated the drug transactions" and "directed actions of other participants."  PSR ¶ 64.  The PSR contends that this enhancement is appropriate because Mr. Kapllani "owned the Arbri Café, reaped the profits of the conspiracy, and directed the actions of others."  See PSR at 34 (Probation Officer's Response to Defendant's Objection No. 17).

To be sure, the government attempted at trial to portray Mr. Kapllani as the supposed "leader" of the conspiracy charged in this case—going so far as labelling the conspiracy "the Kapllani Group"—a label never used by any of the individuals allegedly involved in the charged conspiracy.  The government also presented various trial chalks that deliberately attempted to

---

[2] Indeed, the largest amount of powder cocaine actually presented at trial was the three kilograms provided by the undercover officers during the "reverse sting" in Florida.

place Mr. Kapllani at the center of the supposed conspiracy. But the the evidence actually presented by the government at trial failed to establish that Mr. Kapllani held any leadership role in connection with the charged activity.

For example, while there is certainly evidence that Mr. Kapllani travelled to Florida to participate in a transaction with Mr. Mendoza, the government did not present any evidence that Mr. Kapllani was ever "directing" or "instructing" Mr. Mendoza regarding the specifics of that transaction. To the contrary, it was Mr. Mendoza who coordinated and set up the transaction with the undercover officers. The suggestion that Mr. Mendoza was merely acting as an intermediary between Mr. Kapllani and Mr. Mendoza is belied by the videotape of the deal, during which Mr. Mendoza plays an active and independent role in coordinating the transaction.

Similarly, while Mr. Kapllani certainly had an ownership interest in the Arbri Café, that fact alone is insufficient to make him a "leader" or "organizer" of the criminal activity that occurred at that location. Indeed, the evidence presented at trial indicated that Mr. Leka—not Mr. Kapllani—played a far more significant leadership role in cultivating and developing the drug business that operated out of the restaurant. Indeed, there is no dispute that Mr. Mara—the primary cocaine supplier discussed at the trial—was a long-time associate of Mr. Leka. PSR ¶ 15-16. And Mr. Leka—not Mr. Kapllani—was the "principal point of contact" for Mara and Bedini in Boston. PSR ¶ 17. Later, during the period when Mr. Leka apparently had a falling out with Messrs. Mara and Bedini, the evidence showed that it was Mr. Ceku—and not Mr. Kapllani—who met Messrs. Bedini and Mara at Logan Airport, joined them for dinner and brought them to his (Ceku's home). While Kapllani was observed meeting with Bedini and Mara during that visit, there is no evidence to suggest that he was planning or organizing that

9

visit or directing others to a sufficient degree that he can be deemed an "organizer or leader" of the criminal activity pursuant to U.S.S.G. § 3B1.1(a).

Moreover, despite the PSR's claims to the contrary, the government did not present evidence that Mr. Kapllani "reaped the profits" of the charged conspiracy, much less that he ever claimed "any right to a larger share of fruits of the crime," as contemplated by the guidelines. See U.S.S.G. § 3B1.1(a) cmt. n.4.  Indeed, there is no reason to believe that Mr. Kapllani planned or organized any transactions to a greater degree than any other participants, or exercised a sufficient degree of "control and authority" over others such that the leadership enhancement should apply here.  Id.  To the contrary, the evidence presented at trial suggested, at most, that Mr. Kapllani was involved in the conspiracy as a middle-man, allegedly participating in the acquisition of cocaine from individuals such as Messrs. Mara and Bedini and Teta and thereafter selling it for limited profit to individuals such as Mr. Tejada.  That mid-level role is insufficient to support a four-point leadership enhancement under U.S.S.G. § 3B1.1(a).[3]

**CONSIDERATION OF THE PURPOSES SET FORTH IN 18 U.S.C. § 3553(a)**

Of course, the calculation of the sentencing range established by the United States Sentencing Guidelines is only one of the factors that this Court must consider when fashioning an appropriate sentence for Mr. Kapllani in this case.  In addition to the guidelines, this Court must consider all of the purposes identified under 18 U.S.C. § 3553(a), including, *inter alia*, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, to afford adequate deterrence to criminal

---

[3] Notably, the Court did not find that Mr. Mara was an "organizer or leader" pursuant to U.S.S.G. § 3B1.1(a), despite the fact that Mr. Mara supposedly worked directly with Mr. Bedini, Mr. Teta and others to supply cocaine to buyers throughout the United States and Canada.  If Mr. Mara does not qualify for the four-point "organizer or leader" enhancement, then it is unclear how that same enhancement can be applied to Mr. Kapllani.

conduct, and to avoid unwarranted sentencing disparities among similar defendants with similar records who have been found guilty of similar conduct. See 18 U.S.C. § 3553(a)(6).

In this case, as discussed above, Mr. Kapllani contends that his otherwise applicable guideline range is 97 to 121 months. Mindful of the mandatory minimum sentence that is applicable in this case due to the jury's verdict, Mr. Kapllani respectfully requests that the Court impose a sentence of 120 months, a term of imprisonment that is more than sufficient to satisfy the purposes identified in Section 3553. Indeed, that sentence would fall close to the high end of the properly calculated guideline range and therefore would would be "greater than necessary" to achieve the purposes of the sentencing statute. 18 U.S.C. 3553(a).

As an initial matter, a ten year sentence would appropriately consider Mr. Kapllani's personal history and characteristics in fashioning an appropriate sentence in this case. Prior to his involvement in the Arbri Café in 2009, Mr. Kapllani had carved out an exemplary life for himself and his family here in Massachusetts through his own hard work and financial discipline. As evidenced by the letters provided to the Court by his close family members and friends, Mr. Kapllani has always been a hard working individual who was deeply devoted to his wife and two children. See Exhibit A (attached hereto). While that strong personal work ethic and family devotion does not exonerate him in this case, it can be properly considered by the Court when it fashions an appropriate sentence, and is further relevant to a consideration of whether Mr. Kapllani is likely to re-offend after his ultimate release from prison. Given Mr. Kapllani's current age and limited criminal history, there is good reason to believe that he will not re-offend upon his ultimate release—especially if he is able to maintain some hope that he can eventually be reunited with his family. See Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 7 (2010) ("[W]hen prison sentences are

relatively short, offenders are more likely to maintain their ties to family and their community, all of which promote successful reentry into society.").

A ten year sentence for Mr. Kapllani is also appropriate in this case to ensure that there is no unwarranted sentencing disparity among the various defendants who have been convicted of participating in the charged conspiracy. See 18 U.S.S.C. § 3553(a)(6); see also United States v. Reverol- Rivera, 778 F.3d 363, 366 (1st Cir. 2015) (recognizing that a sentence can be "substantively unreasonable because of the disparity with a sentence given to a co-defendant"). As of the date of this Memorandum, this Court has already sentenced several of Mr. Kapllani's co-defendants. Mr. Ceku received a sentence of 78 months, and Mr. Tejada was sentenced to a term of 60 months. Mr. Mara was recently sentenced to a term of 35 months, and Mr. Teta and Mr. Mendoza received even lower sentences (both were sentenced to time served). While these lower sentences can be attributed in part to the fact that these defendants pled guilty before trial, and (at least in some instances) cooperated with government investigators, Mr. Kapllani respectfully suggests that a 120 month sentence in this case would properly account for those factors. Indeed, a sentence of 120 months would still be nearly *four years longer* than any other sentence imposed in this case to date, and would be *more than three times longer* than sentences imposed on a number of his co-defendants. By contrast, a sentence that falls within the PSR's proposed guideline range of 188-235 months would be nearly *ten years longer* than any sentence that has been imposed on any other defendant in this case to date. However one views the evidence regarding Mr. Kapllani in this case, such a dramatic disparity between the sentences imposed on the defendants in this case would be unwarranted.

To be sure, the ten-year sentence proposed here by Mr. Kapllani will be a harsh and difficult sentence for him for him to serve. By the time he is released from custody, he will be

close to 60 years old, and he will have been long separated from his children and his wife. He simply requests that the Court impose a sentence equivalent to the mandatory minimum so that he has a chance to reunite with his family and attempt to become a more productive member of society in the not too distant future.

## CONCLUSION

For all the foregoing reasons, Mr. Kapllani respectfully requests that this Court impose upon him a sentence of incarceration that is no greater than one hundred and twenty (120) months. Mr. Kapllani further requests that, in connection with any sentence to be imposed, the Court recommend that he be placed in a facility that is as close as possible to his family in the Greater Boston area, and that the Court further recommend that he be admitted to a 500-hour substance abuse treatment program. Finally, in light of his inability to pay any fine, Mr. Kapllani respectfully requests that this Court decline to impose any fine in connection with this case, other than the mandatory special assessment.

                                            Respectfully submitted,

                                            */s/ Daniel J. Cloherty*
                                            Daniel J. Cloherty (BBO #565772)
                                            COLLORA LLP
                                            100 High St., 20th Floor
                                            Boston, MA  02110
                                            (617-371-1003)
                                            dcloherty@collorallp.com

                                            *Counsel for Defendant Iskender Kapllani*

Dated:  October 14, 2015

## CERTIFICATE OF SERVICE

      I hereby certify that Defendant Iskender Kapllani's Sentencing Memorandum, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and by email on October 14, 2015 to the following parties:

Christopher J. Pohl
Peter K. Levitt
Assistant U.S. Attorneys
U.S. Attorney's Office
John J. Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210

Carolyn Patten
U.S. Probation Officer
U.S. Probation Office
John J. Moakley U.S. Courthouse
One Courthouse Way, Suite 1200
Boston, MA 02210

                                                           */s/ Daniel J. Cloherty*