1        UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2

3    * * * * * * * * * * * * * *
     *UNITED STATES OF AMERICA    *
4                                 *    CRIMINAL ACTION
              v.                  *    No. 12-10052-RGS-2
5    *                            *
     ISKENDER KAPLLANI,           *
6    a/k/a/ "Alex"                *
     a/k/a "Al"                   *
7    a/k/a "Keno"                 *
     * * * * * * * * * * * * * *
8

9         BEFORE THE HONORABLE RICHARD G. STEARNS
             UNITED STATES DISTRICT JUDGE
10                  DISPOSITION
              November 13, 2015
11

12   APPEARANCES:

13        UNITED STATES ATTORNEY'S OFFICE, (By AUSA
     Christopher J. Pohl), 1 Courthouse Way, Suite 9200,
14   Boston, Massachusetts  02210, on behalf of the United
     States of America
15
          COLLORA LLP, (By Daniel J. Cloherty, Esq.), 100
16   High Street, 20th Floor, Boston, Massachusetts  02110,
     on behalf of the Defendant
17

18

19

20                       Courtroom No. 21
                         1 Courthouse Way
21                       Boston, Massachusetts 02210

22
             James P. Gibbons, RPR, RMR
23              Official Court Reporter
            1 Courthouse Way, Suite 7205
24          Boston, Massachusetts, 02210
               jmsgibbons@yahoo.com
25

1               P R O C E E D I N G S

2          THE CLERK:  All rise for this Honorable Court.

3       Court is open.  You may be seated.

4       The case before this Court carries Case No. 12cr10052,

5    United States at America versus Iskender Kapllani.

6       Counsel, please identify yourselves for the record.

7          MR. POHL:  Good morning, your Honor.  Christopher

8    Pohl on behalf of the United States.

9          MR. CLOHERTY:  Good morning, your Honor.  Dan

10   Cloherty here on behalf of Mr. Kapllani, who, of course, is

11   seated next to me.

12          THE COURT:  I know counsel have reviewed the

13   presentence report.  In addition, I have in the file

14   sentencing memoranda filed by the government and also filed

15   on behalf of Mr. Kapllani with the exhibits, which I have

16   also reviewed.

17      The Probation Office calculates the offense level, I

18   believe, at 36, with a Criminal History Category of I, and

19   an advisory Sentencing Guideline range of 188 to 235 months.

20   There is also a ten-year mandatory minimum sentence that

21   attaches.

22       Mr. Pohl, as is customary, why don't we begin with the

23   government's view of the case.

24          MR. POHL:  Sure.  Very good.  Thank you, your

25   Honor.

1      I won't belabor the points we made in our sentencing

2  memorandum, your Honor.  I think, for a couple of reasons,

3  the government's recommendation of 188 months in prison is

4  the appropriate sentence to be imposed in this case.

5      When you look at all of the 3553(a) factors to balance

6  in this case, I begin with, first, the seriousness of the

7  offense.  You're immanently familiar with the facts, having

8  presided over the trial and a number of other sentencing

9  hearings and so, because of that, I know that you know that

10 this was a significantly large-scale, multi-kilogram drug

11 trafficking organization that was sustained over a prolonged

12 period of time, and where the drugs largely came from

13 Mr. Bedini and Mr. Mara in California, either by themselves

14 or shipped cross-country through Mr. Teta, to the Boston

15 group that I think we fairly have said was headed by

16 Mr. Kapllani.

17     Why do we believe that?  The locus of most of the

18 distributions were at the cafe.  Mr. Kapllani -- I think

19 many of the cooperating witnesses at trial testified that

20 Mr. Kapllani took the lead in coordinating with the

21 California suppliers to bring the drugs to Boston; that a

22 number of the people that were involved in the conspiracy

23 were employed, at least nominally, by Mr. Kapllani at the

24 cafe; that Mr. Kapllani would send, for instance, you know,

25 Mr. Neziri, who lived down the street from the cafe, to

1    Bring drugs from his house, which was located a convenient

2    distance from the cafe, to the cafe in order for them to be

3    distributed.  Mr. Kapllani was present at the time that

4    Wilson Centeno-Nieves, otherwise known as Carlos Manuel

5    Tejeda, arrived to pick up the 2 kilograms of cocaine that

6    were seized by agents during a traffic stop.  And I think

7    you heard that the phone records that were introduced in

8    this case showed that Mr. Tejeda -- that at the time that

9    the agents seized the drugs from Mr. Tejeda, was not an

10   atypical day, that in the course of the weeks and months

11   leading up to the seizure of the 2 kilos, Mr. Tejeda

12   contacted Mr. Kapllani's cellphone in a very familiar

13   fashion:  There would be a short series of exchanges between

14   them, and then after those exchanges took place, Mr. Tejeda

15   would arrive at the cafe, stay for a brief period of time,

16   and then leave.

17       So, in our view, the evidence amply supports the

18   enhancement that Probation has asked, that Mr. Kapllani was

19   a leader or manager of a multi-person drug trafficking

20   conspiracy.

21       In terms of the offense conduct, I think that's really

22   the only difference between Mr. Kapllani and Mr. Bedini,

23   that Mr. Kapllani actively involved and engaged a series of

24   other people to help him distribute large quantities of

25   cocaine here in Boston.

1          Aside from the seriousness of the offense and his

2     serious role in organizing others to facilitate that

3     offense, when I look at the 3553 factors, the one that I

4     think is significant -- the next one that I think is

5     significant is specific deterence.

6          You know, this is a case in which, as you know,

7     Mr. Kapllani was caught red-handed in Florida by detectives

8     who were conducting a drug investigation and who essentially

9     used a police officer to engage in a 3 kilograms of cocaine

10    reverse, where Mr. Kapllani and Bryant Mendoza eagerly, I

11    think, provided large sums of money in order to acquire

12    those kilograms of cocaine.

13         And instead of chastening Mr. Kapllani or curtailing

14    his criminal activities, they -- I think -- I would say it's

15    a fair inference from the rest of the testimony that you

16    heard at the trial that Mr. Kapllani's activity accelerated;

17    that he continued to acquire large quantities of cocaine

18    from California for distribution in Boston while on release

19    from that Florida case, and ultimately that case was adopted

20    and charged as part of the conspiracy that he was tried on.

21         But that is a hard fact, I think, for Mr. Kapllani to

22    get around, that he had an opportunity with that Florida

23    case to consider the error of his ways and that rather than

24    altering his behavior, I think he accelerated the amount of

25    drugs -- or he certainly maintained, and perhaps

accelerated, his acquisition and distribution of cocaine in
Boston in the coming months.

Mr. Kapllani doesn't come before you with an extensive
criminal record.  I think that the prior federal conviction,
by the standards that we see here, Mr. Kapllani -- it could
not be said that Mr. Kapllani has an extensive criminal
record.  I simply note that, at least in the facts as laid
out in the PSR, I don't think that that is a run-of-the-mill
crime.  And I don't think that the drug trafficking
organization that Mr. Kapllani presided over here was a
run-of-the-mill drug trafficking case.  They were well
thought out, well organized.  I think they had some sizable
ambitions that Mr. Kapllani wasn't always able to meet, but
he appears to me to be somebody who has always sought to
maximize the profit from criminal behavior, and in this case
through not only his own efforts but through helping --
through urging others to help him.

So, for all of those reasons, the seriousness of the
offense, the need for general deterence, and this is a case
in which the quantity of drugs at issue calls for a
substantial sentence, the kind of substantial sentence that
is a set forth in the Guidelines, specific deterrence for
Mr. Kapllani, I don't know that a ten-year sentence is going
to do that.  And I know what Mr. Kapllani's age is, and I
know what his record is, but I think his behavior during the

1    pendency of this case shows that he's not someone who's

2    easily specifically deterred.  If he was capable of specific

3    deterence, that Florida arrest would have done it, and it

4    didn't.

5         So in order for both the seriousness of the offense,

6    general deterrence, specifically to deter Mr. Kapllani, and

7    to protect the public from him, I think the 188-month

8    sentence, which is the low end of what I believe is the

9    correctly calculated Guidelines, is appropriate here.

10            THE COURT:  Is the government recommending a fine?

11            MR. POHL:  Your Honor, no.  I will be asking the

12    Court to endorse the government's motion for forfeiture.  We

13    did seize, I think as you know, a large sum of cash from the

14    home of a relative of Mr. Kapllani during his arrest.

15         But I think, as you know from the -- you know, at the

16    time that the case was charged, at least the version of the

17    indictment in which Mr. Kapllani was arrested, I believe the

18    cafe was shuttered, that I think that Mr. Kapllani's efforts

19    to sustain his drug trafficking activities and continue to

20    buy essentially on credit from his California suppliers, had

21    sort of finally caught up with him.  So I don't know -- I

22    did not recommend a fine, and I don't know that -- you could

23    certainly make a case that one is appropriate here, and if

24    you were inclined to do that, a fine within the applicable

25    Guideline range would certainly be called for.

1        I think the forfeiture of the funds would be, I think,

2   at least a start in the right direction towards Mr. Kapllani

3   paying his debt to society.

4        Thank you.

5            THE COURT:  Mr. Cloherty.

6            MR. CLOHERTY:  Sure.

7        Before I get into sentencing, I do want to address that

8   forfeiture issue.  I know what was filed this week.  I think

9   the government is aware there was an objection lodged by

10  Mr. Kapllani's sister, who submitted an affidavit to the FBI

11  that it was her earned money that was seized, that was

12  seized from her apartment.  I think procedurally I am not

13  the person to raise that objection.  I know she has counsel,

14  and she has counsel here who will be lodging an objection to

15  that motion.

16       So I just want to the flag that for the Court so that

17  you know that that's out there.  I think an affidavit was

18  submitted shortly after it was taken.  I think we're now two

19  or three years ago.

20       With respect to sentencing, I really have two things

21  that I am guessing the Court wants to hear at all right now,

22  but my first point really focuses on the Sentencing

23  Guidelines, your Honor, and I've got a couple of points

24  there.  I think they're laid out in my sentencing

25  memorandum, but I want to make clear Mr. Kapllani's

```
1    position.
2         First, with respect to the leadership enhancement.  The
3    PSR applies a four-point leadership enhancement that, we
4    submit, is not supported by the evidence in this case.  And,
5    in fact, that the government -- our position is that the
6    government really did not submit sufficient evidence to
7    support the notion that Mr. Kapllani organized and managed
8    others here.  They certainly had charts that suggested that,
9    and they had -- they kept referring to the "organization,"
10   as if it was being run.  But the actual evidence, which is
11   what I think the Court should look at, is that he had an
12   ownership interest in the cafe, but no evidence that he
13   claimed, as the Guidelines suggest, any kind of larger
14   portion of profits, or that he was anything more than a
15   number of people who were at the cafe.
16        We obviously -- I guess I should make clear on the
17   record, I'm sure the Court hears me this way, I am stuck
18   with the jury verdict.  We dispute a lot of what happened in
19   this case, but even with respect to the jury verdict, we
20   don't think that the jury found -- needed to reach its
21   conclusions by concluding that he was a leader or an
22   organizer or manager.  And I think the evidence that the
23   government presented, presence does not necessarily equate
24   to leadership.  Even the examples that were just cited here
25   was all about him being present at various times or in
```

1    communication with individuals.  That doesn't necessarily

2    show leadership.  There is no evidence that he claimed any

3    kind of larger portion of profits here.

4        And, in fact, the evidence, and even as reflected in

5    the PSR, it was Mr. Leka who had contact with Mr. Mara.  He

6    was the person with the long-standing relationship.  The

7    Court did not apply a leadership enhancement for Mr. Leka.

8        I cannot distinguish between the two of them in terms

9    of what their respective roles were here.  Obviously, again,

10   we dispute the evidence as to Mr. Kapllani.  But even if you

11   accept the evidence as presented by the government, I don't

12   see how Mr. Kapllani gets a leadership role and Mr. Leka

13   does not.

14       Mr. Leka had the long-standing relationship, and even

15   as presented by the government, the organization, such as it

16   was, actually has -- you know, Mr. Mara was at sort of the

17   top of this in terms of supply, and it sort of came down

18   through the Arbri Cafe.  They were in the position of

19   middlemen, and I don't believe the Court applied a

20   leadership enhancement for Mr. Mara either.

21       The government argued in its brief that somehow

22   Mr. Kapllani directed Mr. Teta what to do.  I don't think

23   there's any evidence of that.  I think it's the opposite.

24       I know the Court knows the evidence, so I think I've

25   said enough on that point.

1        The other -- and that's a significant point, I guess,

2   for us because it's a four-point enhancement, which has a

3   huge impact, at least to the extent that the Court's going

4   to look to the Guidelines here, which it will, at least in

5   part.

6        With respect to the drug weight, the same thing.  We

7   think that the PSR inflates far beyond the evidence, and I

8   think in part here we can look to the jury verdict.

9        The jury verdict found that Mr. Bedini was responsible

10  for less than 5 kilograms of cocaine.  If the Court accepts

11  that, then it must be so that the jury rejected a

12  substantial portion of the testimony that was provided by

13  the government through Mr. Teta and Mr. Mara.

14       And that is the largest quantity that is allegedly

15  applied to Mr. Kapllani here.

16       I think it's set forth in my brief, your Honor, but we

17  think the appropriate -- it should be two levels lower here,

18  at least as presented by the government of 5 to 15, and that

19  the Court could still credit some of the evidence if it

20  wanted to.  Again, we dispute all of this, but if you --

21  even if you count the Florida transaction, the transaction

22  with Mr. Teta and -- I'm sorry, Mr. Tejeda, and some of the

23  other evidence, it still doesn't get you over 15.  And the

24  only way the government gets over 15 is some of the

25  extrapolations that they do off of Mr. Teta's version of

1    events.

2          It's simply not true, or can't be true, and I think the

3    evidence that was presented at trial shows it, that Mr. Teta

4    delivered 100 percent of those amounts to the Boston area.

5    He had long-standing connections in Connecticut.  He was

6    delivering to Connecticut and New York.

7          And I think the evidence showed that Mr. Leka and/or

8    the other individuals here in Boston couldn't even afford to

9    pay for one kilogram of cocaine for certain portions of

10   time.  A suggestion that they bought 44, I think, or 48,

11   what's in the PSR, I don't think is supported by the

12   evidence, and the Court could drop two levels there.

13         Lastly, your Honor, I guess I would like to talk about

14   the 2255 factors.  We are bound by this ten-year mandatory

15   minimum here.  And I would suggest to the Court that that

16   sentence would still be by far the longest sentence that the

17   Court will have imposed on any of the defendants in this

18   case, four years longer than any other defendant, and more

19   than double what Mr. Leka, who has a violent history,

20   received; more than triple what Mr. Mara, who I think the

21   Court heard and acknowledged was a major international drug

22   trafficker received.  I acknowledge there is some

23   difference, some defendants cooperated with the government,

24   but still the Court can factor all that in and still give

25   Mr. Kapllani the mandatory minimum sentence, and he would be

1    at the top of the range.

2        The government talks about specific deterrence as one

3    of the factors.  I am not sure why 188 months is needed to

4    specifically deter Mr. Kapllani, and the government somehow

5    thinks that 30 months or less is enough to deter Mr. Mara.

6    But the Court can do that balancing itself and see what the

7    appropriate sentence is.

8        We think that when one considers all of the factors,

9    including disparity of sentences between the individuals

10   here, and Mr. Kapllani's personal history, that ten years is

11   more than enough, and it also includes his age and

12   likelihood of recidivism, as well as what he's facing when

13   he gets out as an immigrant here.

14       So ten years is more than enough.

15       I would ask, in addition, I don't know if the Court is

16   inclined to even talk about a fine, by I think the evidence

17   is that he cannot afford and is unable to pay a fine.  A

18   fine would be an enormous burden, or could threaten to be an

19   enormous burden, on his family, which is already suffering

20   significantly from his absence, his wife and two children,

21   who are trying to struggle without him and under any

22   circumstances will be struggling without him for the next

23   multiple period of years.

24       I would ask that the Court recommend that Mr. Kapllani

25   be designated to a -- I know it's up to the BOP -- but a

1  location as close as possible to Boston so that his children

2  could visit him.

3      I would ask that he be recommended, as reflected in the

4  PSR, that he be eligible for the 500-Hour Drug Treatment

5  Program and have an opportunity to participate in that.

6  There is no doubt that his use of substances contributed to

7  part of the background facts here.

8      And with that, Mr. Kapllani would just ask the Court

9  for consideration and request that the Court enter a

10  sentence equivalent to the mandatory minimum.

11          THE COURT:  Mr. Kapllani, do you wish to be heard

12  on the subject of the sentence?

13          THE DEFENDANT:  No, your Honor.

14          MR. CLOHERTY:  He said, No.

15          THE COURT:  Okay.

16      I did sit through the trial.  I think I am familiar

17  with the evidence, perhaps not as familiar as Mr. Pohl and

18  Mr. Cloherty are, but I think I know the facts of the case

19  as well as a judge could be expected to know them.

20      With respect to the Guidelines, I do think they are

21  appropriate, and I note that the Guidelines -- the one point

22  of contention is on the leadership or organizer.  The First

23  Circuit in Tejada-Beltran draws a distinction between an

24  "organizer" and a "leader."

25      To be a leader, I think, does imply some degree of

1   dominance or control over others, and I think that may

2   overstate Mr. Kapllani's role in the organization as a

3   whole.

4        But the term "organizer," according to go the First

5   Circuit, has a different connotation.  One could be

6   classified as an organizer even though not a leader if one

7   plays a significant role in coordinating others in the

8   facilitation of criminal activity, and I think that fairly

9   describes Mr. Kapllani's position within the organization as

10  I heard it fleshed out at trial.

11       Essentially, I agree with almost everything Mr. Pohl

12  said about the seriousness of the crime and need for

13  deterrence.

14       I just add one additional thought, which is to me,

15  puzzling, that Mr. Kapllani, having been offered asylum by

16  this country, chose to repay the generosity by poisoning his

17  fellow citizens with the distribution of drugs.  I think

18  that, in a sense, almost aggravates the nature of the crime

19  itself.  But beyond that I think Mr. Pohl otherwise

20  accurately describes the harm that Mr. Kapllani caused and

21  the gravity of the crime that was committed.

22       I am going to adopt the government's recommendation as

23  presented.

24       Mr. Kapllani, if you'll stand, please.

25       Mr. Kapllani, pursuant to the Sentencing Reform Act of

1   1984, and having considered the sentencing factors

2   enumerated d at 18, United States Code, Section 3553(a), it

3   is the judgment of the Court that you be committed to the

4   custody of the Bureau of Prisons for a term of 188 months.

5       The Court will recommend participation in the Bureau of

6   Prisons Residential Drug Abuse 500-Hour Treatment Program

7   and will also judicially recommend that you be confined at a

8   facility as close to Boston, commensurate with any security

9   requirements, that the Bureau of Prisons finds necessary to

10  impose.

11       Upon release from custody, you will be placed on

12  supervised release for a term of five years.

13      Within 72 hours of release from custody, you will

14  report in person to the district to which you are released,

15  which I presume will be Massachusetts.

16      The Court will not impose a fine.  Your family, I

17  think, has suffered enough hardship as it is.  The Court

18  will not impose a further financial tax on your family,

19  which does not necessarily mean that a fine in your

20  individual capacity might not be deserved, but the Court in

21  its discretion does not impose it.

22      While on supervised release you will comply with the

23  standard conditions which will be set forth in the Judgment

24  in the case.

25      You will not commit any federal, state, or local

1   crime, nor will you illegally possess a controlled

2   substance.

3        You will refrain from any unlawful use of a controlled

4   substance.

5        You must submit to one drug test within 15 days of

6   release from custody and at least two periodic drug tests

7   thereafter, not to exceed 104 tests per year, as directed by

8   your probation officer.

9        You are required by law to submit to the collection of

10  a DNA sample, again as directed by the Probation Office.

11       You are prohibited from possessing a firearm,

12  destructive device, or other dangerous weapon.

13       You are prohibited from the excessive consumption of

14  alcoholic beverages.

15       You will participate in a program for substance abuse

16  counseling as directed by the Probation Office.  That

17  program may include testing, not to exceed 104 tests per

18  year, to determine whether you have reverted to the use of

19  controlled substances.  You may be required to contribute to

20  the costs of such treatment based on your ability to pay or

21  the availability of a third-party payor.

22        If you are ordered deported, you are to leave the

23  United States and not return without the prior written

24  permission of the Secretary of the Department of Homeland

25  Security.

1    You are required to pay to the United States a special

2    assessment of $100.  By operation of law, that is due

3    immediately.

4        Can I ask the Probation Office, did I cover the terms

5    of the sentence adequately?

6        PROBATION OFFICER:  Yes, your Honor.

7        THE COURT:  All right.  The clerk will advise

8    Mr. Kapllani of his right of appeal.

9        THE CLERK:  Mr. Kapllani, you have the right to

10   file a Notice of Appeal in this case.  If you do wish to

11   file a Notice of Appeal, you must file it within 14 days

12   from the date in which I enter the judgment.  If you cannot

13   afford an attorney to file the appeal on your behalf, you

14   may request me to do it, and I will file it in the Clerks

15   Office for you.

16       THE COURT:  Mr. Pohl, I think it better that I

17   reserve acting on the forfeiture order until I have the

18   opportunity to hear the competing claim that's made on the

19   assets that are involved.

20       MR. POHL:  Fair enough.  Thank you, your Honor.

21   I agree with Mr. Cloherty's sort of procedural

22   statement.  So I think that's fine.

23       MR. CLOHERTY:  Can I ask a question about that,

24   your Honor?  Her counsel is here.

25       Should her counsel simply file something with the

1    Court, or how would that --

2           THE COURT:  As I understand the procedure, she

3    should, through counsel, file a claim to the funds stating

4    the grounds on which the claim is made.  If I think an

5    evidentiary hearing is appropriate, then I will schedule one

6    before entering any order.

7           MR. CLOHERTY:  We'll look at the procedure.  I

8    think she's done that.

9           THE COURT:  Yes.  I am just not sure, but perhaps

10   Terri can check on the docket to see if something has been

11   filed.

12          MR. CLOHERTY:  It may not have been filed with you.

13   It may just have been filed with the government.

14          THE COURT:  All right.

15      Good luck, Mr. Kapllani.  We will be adjourned.

16          THE CLERK:  All rise.

17       (Proceedings adjourned.)

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


/s/James P. Gibbons                    January 29, 2016
     James P. Gibbons




                JAMES P. GIBBONS, CSR, RPR, RMR
                    Official Court Reporter
                 1 Courthouse Way, Suite 7205
                  Boston, Massachusetts 02210
                     jmsgibbons@yahoo.com